IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA
Plaintiff
vs

CRIMINAL 01-520CCC

JAIME PINILLOS
Defendant

**ORDER**

  Before the Court are the Objections to the Pre-Sentence Investigation Report filed by defendant Jaime Pinillos on September 19, 2006 (docket entry 389), which also include several requests for downward departures under the advisory sentencing guidelines. Defendant objects to the format and content of the Pre-Sentence Report (PSR) claiming that it does not reflect all the statutory sentencing factors that the Court must consider pursuant to 18 U.S.C. § 3553(a), challenges the base offense level of 36 determined in the PSR under U.S.S.G. 2D1.1(c)(2) for the offense having involved an amount of 100 kilograms of cocaine, quarrels with the two-level upward adjustment under U.S.S.G. § 3C1.1 for obstruction of justice founded on his perjured testimony at trial and pleads for departures based on his age and family circumstances, mental condition, and family ties and responsibilities.

  Because some of defendant's current objections and requests for departure are a repetition of those raised during the original sentencing process (see e.g. docket entry 222), we merely reiterate here our primal findings on them- overruling the objection to the two-level adjustment for obstruction of justice under U.S.S.G. § 3C1.1 and denying the downward departure requested for his mental condition under U.S.S.G. § 5K2.13.  See transcript of sentencing hearing of defendant Pinillos (docket entry 283, at pp. 22-23), see also docket entry 243.  While defendant had failed to object then to his determined base offense level, the arguments he raises now were previously advanced by his co-defendants (see docket entries 188 & 219) and rejected by the Court (docket entry 214 & 229).  However, we have

done an independent review of the evidence by re-reading our trial notes.  Based on our notes and the narrative of the evidence of the Court of Appeals in its decision affirming the convictions and remanding for resentencing, United States v. Pinillos, 419 F.3d 61 (1st Cir. 2005), the following facts were established at trial:

(1) Informant Nelson "Rafa" Rodríguez had met Jaime Pinillos, both of Colombian origin, in early 2001, several months before they met again in July 2001 in Puerto Rico when Pinillos telephoned him from Miami to say that he had a customer to buy 100 kilograms of cocaine.

(2) "Rafa" asked Pinillos if the customer had the money - approximately $1.4 million, since the going rate was about $13,500.00 per kilo.  Pinillos confirmed that the buyer had the money.

(3) The informant was later authorized by the DEA to conduct a reverse sting operation.  Granted, that in such an operation it is the government agent who offers to sell the drugs, but the amount of the sale was set at 100 kilos by Pinillos himself.

(4) The informant's telephone calls with Pinillos were recorded.

(5) During the first meeting at the bakery, and the second meeting at the Plaza Carolina shopping mall, Pinillos in representation of the buyers, negotiated the logistics of the exchange of the merchandise and the money with the informant "Rafa" and the undercover agent Toro who passed off as the sellers.  Pinillos position was that they take the merchandise, meaning the drugs, and then come up with the money.  He also argued that his friend wanted to test the quality of the cocaine by buying 1 kilo up front.  The sellers' side offered instead a 25-kilo package from which the buyers could test 1 kilo.  Previous to this hassle over the exchange of the money and the drugs and the testing of the merchandise, as stated by the Court of Appeals in its Opinion at p. 63, "[a]fter initial introductions, Pinillos assured the sellers that he had $700,000.00 ready for the purchase."  This conversation was held during the first July 9, 2001 meeting at the bakery.  Regarding the total amount of the sale, the Court observes at footnote 2, that "Rafa" and Pinillos had previously discussed paying $700,000.00 (half the purchase price) upfront in Puerto Rico, and the remainder in New York when the drugs were actually delivered."

(6) The conversations between Pinillos and co-defendant Campusano with the informant "Rafa" and the undercover agent during the second meeting resulted in reaching an agreement as to the exchange of the drugs and the money. Co-conspirator Campusano would drive the car containing the money to the handoff site, once "Rafa" counted the money the buyers would drive off. Then "Rafa" would signal for a car containing the drugs to come to the site. Campusano would drive that car away, leaving Pinillos with the "sellers" as a guarantee or hostage. Once the buyers had verified the quantity and quality of the drugs, they would return to the "money" car; the sellers would take the money and Pinillos would be released. This would be done at their third and last meeting on July 11, 2001, at the parking lot of the Metropol Restaurant. By virtue of this agreement, the buyers and sellers resolved the lack of trust and the impasse that they had confronted regarding the details of the delivery and the payment. Nonetheless, when they met at the agreed site, the informant and the undercover agent grew concerned that something was amiss. Although Pinillos assured them that he had seen the money and that the buyers were not planning to rob the sellers, he appeared anxious, while Campusano, who was supposed to drive the money car to the site, arrived on foot. The undercover agent then called the supporting agents who moved in to arrest Pinillos and Campusano. The facts that no drugs or money were found on or near the two defendants is of little significance.

The several conversations recorded throughout the conspiracy led the jury to unanimously find in the special verdict form that the quantity of cocaine involved was more than 5 kilograms as charged. At no time during the negotiations between the defendants and the sellers was there any reduction either in the amount of the drug transaction, i.e. 100 kilograms, or in the price. The discussions on the logistics of the exchange of money/drugs and on the testing of the quality of the drugs by producing first 1 kilo or a 25-kilo package from which 1 kilo would be extracted for testing, were resolved as explained before by adopting the plan of two cars, one containing the money, the other containing the drugs, and Pinillos as a hostage. This in no way changed the agreed-upon amount of 100 kilos at $13,500.00 per kilo, or a total of approximately $1.4 million. After listening to all of the

conversations had throughout the conspiracy, the Court is convinced that these were the terms of the drug transactions negotiated by the parties and that the discussions on lesser amounts for testing the quality or on the logistics of the exchange of the money and the drugs are being magnified by Mr. Pinillos and placed out of context. Likewise, he has attempted to distance himself by stating that he did not have the financial capacity to deal in those amounts or those price ranges. We repeat that it was he who fixed the amount of 100 kilos from the very beginning. He also had a significant part in attempting to convince the sellers to deliver the merchandise before the buyers came up with the money. Whatever was behind his attempts to pay later, the fact remains that from beginning to end neither the 100 kilo amount nor the price changed.

As for defendant's objections to the PSR's format, we disagree with his averment that it gives controlling weight to the offense conduct and guideline calculations and minimizes the history and characteristics of the defendant. The PSR, in fact, includes relevant information on all the sentencing factors which the Court needs to consider under 18 U.S.C. § 3553(a). In order for it to include the most updated information, it was ordered to be revised (see endorsed Order dated December 6, 2005 on docket entry 311), and as a result defendant was interviewed again on January 18, 2006 (PSR, at ¶ 27.) The PSR describes his family ties, family responsibilities, community ties, mental, emotional and physical conditions, educational and vocational skills, and employment record. PSR, at ¶¶ 27-41. There is simply no merit to defendant's objection.

Finally, we turn to the remaining requests for downward departure. Defendant first seeks a departure grounded on his age and family circumstances. But U.S.S.G. 5H1.1 provides that age "is not ordinarily relevant in determining whether a departure is warranted," and specifically states that "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm." Defendant is 39 years old, and "enjoys good health, aside from back spasms..." PSR, at ¶ 34. There are simply no circumstances present in this case which would serve to justify a departure under U.S.S.G. 5H1.1.

Defendant has also moved for a departure based on his family ties and

responsibilities. U.S.S.G. § 5H1.6 states that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." In support of his request, defendant asserts that he is married and has a ten-year old child, as well as a mother, all whom await his return to Colombia, and claims that his absence has become a tremendous financial and emotional hardship for his wife and daughter and emotional hardship for his mother. While we recognize that the situation confronted by defendant's family members is unfortunate, it does not exceed the harm ordinarily incident to incarceration for a similarly situated defendant. Thus, we see no reason to depart under U.S.S.G. § 5H1.6 either.

For the reasons stated, defendant's Objections to the Pre-Sentence Investigation Report (docket entry 389) are OVERRULED, and his requests for downward departure are DENIED.

Defendant has also filed on the eve of sentencing a Motion Joining the Second Supplemental Motion filed by co-defendant Rodrigo Campusano (docket entry 414). This motion is clearly untimely and will not be considered by the Court.

SO ORDERED.

At San Juan, Puerto Rico, on May 3, 2007.

S/CARMEN CONSUELO CEREZO<br>
United States District Judge